Justice Thomas,
with whom The ChieF Justice, Justice O’Connor, and Justice Scalia join, dissenting.
In light of the independence guaranteed Inspectors General by the Inspector General Act of 1978, 5 U. S. C. App. § 1 et seq., p. 1381, investigators employed in the Office of Inspector General (OIG) will not represent agency management in the typical case. There is no basis for concluding, as the Federal Labor Relations Authority (Authority) *247 did, that in this case the investigator from OIG for the National Aeronautics and Space Administration was a “representative of the agency” within the meaning of 5 U. S. C. § 7114(a)(2)(B). I respectfully dissent.
h — <
The National Aeronautics and Space Administration is headquartered in Washington, D. C. Among other agency subcomponents are the George C. Marshall Space Flight Center (Marshall Center), located in Huntsville, Alabama, and the Office of Inspector General, which is headquartered in Washington, D. C., but maintains offices in all of the agency’s other subcomponents, including the Marshall Center. In January 1993, the Federal Bureau of Investigation received information that an employee of the Marshall Center, who is referred to in the record only as “P,” was suspected of spying upon and threatening various co-workers. The FBI referred the matter directly to NASA’s OIG, and an investigator for that Office who was stationed at the Marshall Center was assigned the case. He contacted P, who agreed to be interviewed so long as his attorney and a union representative were present; the investigator accepted P’s conditions. App. to Pet. for Cert. 61a. At the interview, OIG’s investigator read certain ground rules, which provided, inter alia, that the union representative was “ ‘not to interrupt the question and answer process.’” Ibid.[1] The union filed an unfair labor practice charge, claiming that the interview was not conducted in accordance with the requirements of 5 U. S. C. § 7114(a)(2)(B), as the Authority has interpreted that provision. The Authority’s General Counsel issued a complaint to that effect, and the Authority found that *248 NASA headquarters and NASA’s OIG had committed unfair labor practices. On review, the Court of Appeals for the Eleventh Circuit granted the Authority’s application for enforcement of its order. 120 F. 3d 1208 (1997).
As the Court correctly recognizes, ante, at 233, several points are not in dispute at this stage of the litigation. The fact that P requested union representation and reasonably believed that disciplinary action might be taken against him on the basis of information developed during the examination has never been in dispute in this ease. See NASA, 50 F. L. R. A. 601, 606, n. 4 (1995). Although petitioners contested the matter before the Authority, on review in the Eleventh Circuit, they conceded that OIG’s investigator conducted the interview of P in a way that did not comport with what § 7114(a)(2)(B) requires. See 120 F. 3d, at 1211. And all parties agree that the relevant “agency” for purposes of § 7114(a)(2)(B) is NASA. One other point is not disputed— the “representative” to which § 7114(a)(2)(B) refers must represent agency management, not just the agency in some general sense as the Court suggests, ante, at 233-234, 240. See 50 F. L. R. A., at 614 (“ ‘[Representative of the agency’ under section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcomponents of the agency”); id., at 615 (“ ‘We doubt that Congress intended that union representation be denied to the employee solely because the management representative is employed outside the bargaining unit’ ”) (quoting Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93, 99 (CA3 1988)); Brief for Respondent FLRA 16 (“The Authority has determined that the phrase ‘representative of the agency[5] should not be so narrowly construed as to exclude management personnel, such as the OIG, who are located in other components of the agency”); id., at 21; Reply Brief for Petitioners 1 (“[A] ‘representative of the agency’ in Section 7114(a)(2)(B) must be a representative of agency management?’).
*249 Since an agency’s stated reasons for decision are important in any case reviewing agency action, I summarize in some detail what the Authority actually said in this case. It began by stating its conclusion:
“We reach this conclusion based upon our determination that: (1) the term 'representative of the agency’ under section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcomponents of the agency; (2) the statutory independence of agency OIGs is not determinative of whether the investigatory interviews implicate section 7114(a)(2)(B) rights; and (3) section 7114(a)(2)(B) and the IG Act are not irreconcilable.” 50 P. L. E. A., at 614.
The Authority headed its discussion of its first determination “Section 7114(a)(2)(B) Covers the Actions of Management Personnel Employed in Other Subcomponents of the Agency.” Id., at 615. This statement appears to suggest OIG itself is part of agency management. But the remainder of the Authority’s discussion appears to advance a different theory — one that OIG serves as agency management’s agent because OIG inspectors ultimately report to NASA’s Administrator, see ibid. (OIG’s investigator, “although employed in a separate component from the MSFC, is an employee of and ultimately reports to the head of NASA”), and because OIG provides information to management that sometimes results in discipline to union employees, ibid. (“OIG not only provides investigatory information to NASA [headquarters] but also to other NASA subcomponent offices”); see also id., at 616 (Congress would regard an OIG investigator as a representative of the agency because “[t]he information obtained during the course of an OIG investigatory examination may be released to, and used by, other subcomponents of NASA to support administrative or disci *250 plinary actions taken against unit employees”).[2] The Authority recognized that the Inspector General Act grants an Inspector General, or IG, “a degree of freedom and independence from the parent agency.” Id., at 615. It thought, however, that the Inspector General’s autonomy “becomes nonexistent” when the IG’s investigation concerns allegations of misconduct by agency employees in connection with their work and the information obtained during the investigation possibly would be shared with agency management. Ibid. As it further explained: “[I]n some circumstances, NASA, OIG performs an investigatory role for NASA [headquarters] and its subcomponents, specifically [the Marshall Center].” Id., at 616 (emphasis added). Moreover, the Authority reasoned, the Inspector General “plays an integral role in assisting the agency and its subcomponent offices in meeting the agency’s objectives.” Id., at 617. In light of all this, the Authority concluded:
“Plainly, the IG represents and safeguards the entire agency’s interests when it investigates the actions of the agency’s employees. Such activities support, rather than threaten, broader agency interests and make the IG a participant, with other agency components, in meeting various statutory obligations, including the agency’s labor relations obligations under the Statute.” Ibid.
*251 II
The Authority's recognition that § 7114(a)(2)(B) protections are only triggered when an investigation is conducted by, or on behalf of, agency management, is important and hardly surprising. See, e. g., 50 P. L. R. A., at 614 (“section 7114(a)(2)(B) should not be so narrowly construed as to exclude management personnel employed in other subcompo-nents of the agency” (emphasis added)); Brief for Respondent FLRA 21 (“The Authority’s conclusion that the word ‘representative,’ or phrase ‘representative of the agency,’ includes management personnel in other subcomponents of the ‘agency’ is entirely consistent with the language of the [Federal Service Labor-Management Relations Statute]” (emphasis added)). It is important because the Court seems to think it enough that NASA’s OIG represent NASA in some broad and general sense. But as the Authority’s own opinion makes clear, that is not enough — NASA’s OIG must represent NASA’s management to qualify as a “representative of the agency” within the meaning of § 7114(a)(2)(B). The Authority’s position is hardly surprising in that the Federal Service Labor-Management Relations Statute (FSLMRS) plainly means just that.[3] The FSLMRS governs labor-management relations in the federal sector. Section 7114(a)(2)(B) is captioned “Representation rights and duties,” and every employee right contained therein flows from the collective-bargaining relationship.[4] As petitioners note, *252 in each of the three instances where the FSLMRS refers to an agency representative, it does so in the context of the collective-bargaining relationship between management and labor. See §§ 7103(a)(12), 7114(a)(2)(A), 7114(a)(2)(B).[5]
Investigators within NASA’s OIG might be “representatives of the agency” in two ways. First, if NASA’s Inspector General and NASA’s OIG itself were part of agency management, I suppose that employees of the Office necessarily would be representatives of agency management. But, to the extent that the Authority meant to hold that, there is no *253 basis for its conclusion. OIG has no authority over persons employed within the agency outside of its Office and similarly has no authority to direct agency personnel outside of the Office. Inspectors General, moreover, have no authority under the Inspector General Act to punish agency employees, to take corrective action with respect to agency programs, or to implement any reforms in agency programs that they might recommend on their own. See generally Inspector General Authority to Conduct Regulatory Investigations, 13 Op. Off. Legal Counsel 54, 55 (1989); Congressional Research Service, Report for Congress, Statutory Offices of Inspector General: A 20th Anniversary Review 7 (Nov. 1998). The Inspector General is charged with, inter alia, investigating suspected waste, fraud, and abuse, see 5 U. S. C. App. §§ 2, 4, 6, and making policy recommendations (which the agency head is not obliged to accept), see §§ 4(a)(3), (4), but the Inspector General Act bars the Inspector General from participating in the performance of agency management functions, see § 9(a). Moreover, OIG is not permitted to be party to a collective-bargaining relationship. See 5 U. S. C. § 7112(b)(7) (prohibiting “any employee primarily engaged in investigation or audit functions” from participating in a bargaining unit).
Investigators within NASA’s OIG might “represent” the agency if they acted as agency management’s representative — essentially, if OIG was agency management’s agent or somehow derived its authority from agency management when investigating union employees. And something akin to an agency theory appears to be the primary basis for the Authority’s decision. The agency theory does have a textual basis — § 7114(a)(2)(B)’s term “representative,” as is relevant in this context, can mean “standing for or in the place of another: acting for another or others: constituting the agent for another especially] through delegated authority,” or “one that represents another as agent, deputy, substitute, or delegate usu[ally] being invested with the authority of the princi *254 pal.” Webster’s Third New International Dictionary 1926-1927 (1976); see also Webster’s New International Dictionary 2114 (2d ed. 1957) (“[b]eing, or acting as, the agent for another, esp. through delegated authority”). The agency notion, though, is counterintuitive, given that, as the majority acknowledges, ante, at 238, the stated purpose of the Inspector General Act was to establish “independent and objective units” within agencies to conduct audits and investigations, see 5 U. S. C. App. §2 (emphasis added).
To be sure, NASA’s OIG is a subcomponent of NASA and the Inspector General is subject to the "general supervision,” §3(a), of NASA’s Administrator (or of the “officer next in rank below” the Administrator, ibid.).[6] But, as the Fourth Circuit has observed, it is hard to see how this “general supervision” amounts to much more than “nominal” supervision. See NBC v. FLRA, 25 F. 3d 229, 235 (1994). NASA’s Inspector General does not depend upon the Administrator’s approval to obtain or to keep her job. NASA’s Inspector General must be appointed by the President and confirmed by the Senate, “without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.” 5 U. S. C. App. §3(a). Only the President, and not NASA’s Administrator, may remove the Inspector General, and even then the President must provide Congress with his reasons for doing so. § 3(b).[7] In addition, the Administrator has no *255 control over who works for the Inspector General. Inspectors General have the authority to appoint an Assistant Inspector General for Auditing and another Assistant Inspector General for Investigations, §§ 3(d)(1), (2), may “select, appoint, and employ such officers and employees as may be necessary,” § 6(a)(7), and also are authorized to employ experts and consultants and enter into contracts for audits, studies, and other necessary services, see §§ 6(a)(8), (9); see generally P. Light, Monitoring Government: Inspectors General and the Search for Accountability 175-185 (1993) (describing the “unprecedented freedom” that IG’s have under the Inspector General Act in organizing their offices and how IG’s have enhanced their independence by exercising their statutory authority in this regard to the fullest).
Inspectors General do not derive their authority to conduct audits and investigate agency affairs from agency management. They are authorized to do so directly under the Inspector General Act. 5 U. S. C. App. §2(1). Neither NASA’s Administrator, nor any other agency official, may “prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpoena during the course of any audit or investigation.” §3(a). The Administrator also may not direct the Inspector General to undertake a particular investigation; the Inspector General Act commits to the IG’s discretion the decision whether to investigate or report upon the agency’s programs and operations. § 6(a)(2). The Authority’s counsel argued to the contrary, but could not provide a single example of an instance where an ageney head *256 has directed an Inspector General to conduct an investigation in a particular manner. Tr. of Oral Arg. 40, see also id., at 46-48 (counsel for respondent American Federation of Government Employees (AFGE) also unable to provide an example of agency head direction of OIG investigation). The Authority’s counsel also could not support his assertion that agency heads have the power to direct the Inspector General to comply with laws such as the FSLMRS. Id., at 41-43.
Inspectors General, furthermore, are provided a broad range of investigatory powers under the Act. They are given access to "all records, reports, audits, reviews, documents, papers, recommendations, or other material” of the agency. 5 U. S. C. App. § 6(a)(1). They may issue subpoenas to obtain such information if necessary, and any such subpoena is enforceable by an appropriate United States district court. § 6(a)(4).[8] The Inspector General also may "administer to or take from any person an oath, affirmation, or affidavit, whenever necessary.” § 6(a)(5). Inspectors General do not have the statutory authority to compel an employee’s attendance at an interview. But if an employee refuses to attend an interview voluntarily, the Inspector General may request assistance, § 6(a)(3), and the agency head "shall . . . furnish . . . information or assistance” to OIG, § 6(b)(1).
NASA’s Inspector General does, as the Authority claimed, provide information developed in the course of her audits and investigations to the Administrator. §§2(3), 4(a)(5). But she has outside reporting obligations as well. Inspectors General must prepare semiannual reports to Congress “summarizing the activities of the Office.” § 5. Those reports first are delivered to the agency head, § 5(b), and the Administrator may add comments to the report, § 5(b)(1), but *257 the Administrator may not prevent the report from going to Congress and may not change or order the Inspector General to change his report. Moreover, the Inspector General must notify the Attorney General directly, without notice to other agency officials, upon discovery of “reasonable grounds to believe there has been a violation of Federal criminal law.” §4(d).
As a practical matter, the Inspector General’s independence from agency management is understood by Members of Congress and Executive Branch officials alike. This understanding was on display at the recent congressional hearing on the occasion of the Inspector General Act’s 20th anniversary. For example, Senator Thompson, Chairman of the Senate Government Affairs Committee, stated that “[t]he overarching question we need to explore is whether the Executive Branch is providing IGs with support and attention adequate to ensure their independence and effectiveness.” Hearings on “The Inspector General Act: 20 Years Later” before the Senate Committee on Governmental Affairs, 105th Cong., 2d Sess., 2 (1998). He further explained that “[t]he IGs... are paid to give [Congress] an independent and objective version [of] events.” Ibid. Senator Glenn, then the ranking minority member, opined that “the IG’s first responsibility continues to be program and fiscal integrity; they are not ‘tools’ of management.” Id., at 7.
At those hearings, testimony was received from several Inspectors General. June Gibbs Brown, the Inspector General for the United States Department of Health and Human Services, praised Secretary Shalala for “never, not even once, [seeking] to encroach on [her] independence.” Id., at 4. In her written testimony, she offered: “A key component of OIG independence is our direct communication with the Members and staff of the Congress. Frankly, I suspect that no agency head relishes the faet that IGs have, by law, an independent relationship with oversight Committees. Information can and must go directly from the Inspectors Gen *258 eral to the Hill, without prior agency and administration clearance.” Id., at 45. The testimony of Susan Gaffney, the Inspector General for the United States Department of Housing and Urban Development, revealed that agency managers know all too well that the Inspector General is independent of agency management:
“[I]t is to me somewhat jolting, maybe shocking, that the current Secretary of HUD has exhibited an extremely hostile attitude toward the independence of the HUD OIG, and, as I have detailed in my written testimony, he has, in fact, let this hostility lead to a series of attacks and dirty tricks against the HUD OIG.” Id., at 6.
In her written testimony, Ms. Gaffney farther explained that, while, “[i]deally, the relationship between an IG and the agency head is characterized by mutual respect, a common commitment to the agency mission, and a thorough understanding and acceptance of the vastly different roles of the IG and the agency head,” the current Secretary, in her view, was “uncomfortable with the concept of an independent Inspector General who is not subject to his control and who has a dual reporting responsibility.” Id., at 48-49.
The Authority essentially provided four reasons why OIG represented agency management in this case: because OIG is a subcomponent of NASA and subject to the “general supervision” of its Administrator; because it provides information obtained during the course of its investigations to NASA headquarters and its subcomponents; because that information is sometimes used for administrative and disciplinary purposes; and because OIG’s functions support broader agency objectives. In my view, the fact that OIG is housed in the agency and subject to supervision (an example of which neither the Authority nor the Court can provide) is an insufficient basis upon which to rest the conclusion that OIG’s employees are “representatives” of agency management. It is hard to see how OIG serves as agency management’s agent *259 or representative when the Inspector General is given the discretion to decide whether, when, and how to conduct investigations, See 5 U. S. C. App. §§3(a), 6(a).[9]
The fact that information obtained in the course of OIG interviews is shared with agency management and sometimes forms the basis for employee discipline is similarly unimpressive. The Court suggests that when this happens, OIG and agency management act in “concert.” Ante, at 242, n. 7. The truth of the matter is that upon receipt of information from OIG, agency management has the discretion to impose discipline but it need not do so. And OIG has no determinative role in agency management’s decision. See 5 U. S. C. App. § 9(a) (Inspector General may not participate in the performance of agency management functions). Although OIG may provide information developed in the course of an investigation to agency management, so, apparently, does the FBI, the DEA, and local police departments. See, e. g., 63 Fed. Reg. 8682 (1998) (FBI’s disclosure policy); 62 Fed. Reg. 36572 (1997) (Immigration and Naturalization Service (INS) Alien File and Central Index System); 62 Fed. Reg. 26555 (1997) (INS Law Enforcement Support Center *260 Database); 61 Fed. Reg. 64219 (1996) (DEA); 60 Fed. Reg. 66648 (1995) (Secret Service, Bureau of Alcohol, Tobacco, and Firearms, and other Treasury components); 60 Fed. Reg. 18853 (1995) (United States Marshals Service (USMS)); 54 Fed. Reg. 42060 (1989) (FBI, USMS, and various Department of Justice record systems); see also 31 CFR §1.36 (1998) (listing routine uses and other exemptions in disclosure of Treasury agencies’ records). Surely it would not be reasonable to consider an FBI agent to be a “representative” of agency management just because information developed in the course of his investigation of a union employee may be provided to agency management. Merely providing information does not establish an agency relationship between management and the provider.
Similarly, the fact that OIG may promote broader agency objectives does not mean that it acts as management’s agent. To be sure, as the Court points out, ante, at 240, OIG’s mission is to conduct audits and investigations of the agency’s programs and operations. See 5 U. S. C. App. §§2, 4(a). But just because two arms of the same agency work to promote overall agency concerns does not make one the other’s representative. In any event, OIG serves more than just agency concerns. It also provides the separate function of keeping Congress aware of agency developments, a function that is of substantial assistance to the congressional oversight function.
The Court mentions, ante, at 242, that the Inspector General lacks the authority to compel witnesses to appear at an interview as if that provided support for the Authority’s decision. Perhaps it is of the view that because the Inspector General must rely upon the agency head to compel an employee’s attendance at an interview, management’s authority is somehow imputed to OIG, or OIG somehow derives its authority from the agency. This proposition seems dubious at best. The Inspector General is provided the authority to investigate under the Inspector General Act, and is *261 given power to effectuate her responsibilities through, inter alia, requesting assistance as may be necessary in carrying out her duties. 5 U. S. C. App. § 6(a)(3). The head of the agency must furnish information and assistance to the IG, “insofar as is practicable and not in contravention” of law. § 6(b)(1). Perhaps, then, when agency management directs an employee to appear at an OIG interview, management acts as OIG’s agent.
The proposition seems especially dubious in this case, as P agreed to be interviewed. The record does not reveal that NASA’s management compelled him to attend the interview nor does it reveal that P was threatened with discipline if he did not attend the interview. The Eleventh Circuit, to be sure, indicated that OIG’s investigator threatened P with discipline if he did not answer the questions put to him. But that threat, assuming it indeed was made, had little to do with attendance and more to do with the conduct of the interview. As the Authority has interpreted § 7114(a)(2)(B), as the Court notes, ante, at 242, n. 7, no unfair labor practice is committed if an employee who requests representation is given the choice of proceeding without representation and discontinuing the interview altogether. Perhaps it could be argued that by threatening P with discipline if he did not answer the questions put to him, rather than giving P the ehoice of proceeding without representation, that OIG’s investigator invoked agency management’s authority to compel (continued) attendance. Along those lines, respondent AFGE contends that OIG’s representative must have been acting for agency management by threatening P with discipline because only NASA’s Administrator and his delegates, 5 U. S. C. § 302(b)(1); 42 U. S. C. § 2472(a), have the authority to discipline agency employees. Brief for Respondent AFGE 15-16. If OIG’s investigator did mention that P could face discipline, he was either simply stating a fact or clearly acting ultra vires. OIG has no authority to discipline or otherwise control agency employees. Since the mere in *262 vocation of agency management’s authority is not enough to vest that authority with OIG’s investigator, the argument, then, must be that it was reasonable for P to believe that OIG’s investigator might have the ability to exercise agency management’s authority. That is a question we simply cannot answer on this record. And more important, I do not think that § 7114(a)(2)(B) can be read to have its applicability turn on an after-the-fact assessment of interviewees’ subjective perceptions, or even an assessment of their reasonable beliefs.
* * *
In light of the Inspector General’s independence — guaranteed by statute and commonly understood as a practical reality — an investigator employed within NASA’s OIG will not, in the usual course, represent NASA’s management within the meaning of § 7114(a)(2)(B). Perhaps there are exceptional cases where, under some unusual combination of facts, investigators of the OIG might be said to represent agency management, as the statute requires. Cf. FLRA v. United States Dept. of Justice, 137 P. 3d 683, 690-691 (CA2 1997) (“So long as the OIG agent is questioning an employee for bona fide purposes within the authority of the [Inspector General Act] and not merely accommodating the agency by conducting interrogation of the sort traditionally performed by agency supervisory staff in the course of carrying out their personnel responsibilities, the OIG agent is not a 'representative’ of the employee’s agency for purposes of section 7114(a)(2)(B)”), cert. pending, No. 98-667. This case, however, certainly does not present such facts. For the foregoing reasons, I respectfully dissent.

 It appears that OIG’s inspector informed P that he would face dismissal if he did not answer the questions put to him. See 120 F. 3d 1208, 1210, n. 2 (CA11 1997).

 The Authority also relied on a policy ground here. It asserted that there was “no basis in the Statute or its legislative history to make the existence of [the representational rights provided by §7114] dependent upon the organizational entity within the agency to whom the person conducting the examination reports.” 50 F. L. R. A., at 615. It elaborated, in a footnote, that “[i]f such were the case, agencies could abridge bargaining unit rights and evade statutory responsibilities under section 7114(a)(2)(B), and thus thwart the intent of Congress, by utilizing personnel from other subcomponents (such as the OIG) to conduct investigative interviews of bargaining unit employees.” Id., at 615, n. 12.

 Although it is. significant that the Authority recognized below and recognizes here that the statutory phrase “representative of the agency” refers to a representative of agency management, I do not, as the Court asserts, ante, at 245-246, n. 9, rest the argument on the premise that the point is conceded. Rather, in light of the context in which the phrase appears, and in light of the very subject matter of the statute, the phrase plainly has that meaning.

 Section 7114(a)(1) details what “[a] labor organization which has been accorded exclusive recognition” is entitled to and must do; § 7114(a)(2) indicates when an exclusive representative may be present at discussions or examinations conducted by agency management; § 7114(a)(3) requires *252 agency management annually to inform its employees of their rights under § 7114(a)(2)(B); § 7114(a)(4) obligates management and the exclusive representative to bargain in good faith for purposes of arriving at a eollective-bargaining agreement; § 7114(a)(5) provides that the rights of an exclusive representative do not limit an employee’s right to seek other representation, for example, legal counsel; § 7114(b) speaks to the duty of good faith imposed on management and the exclusive representative under § 7114(a)(4); and § 7114(c) requires the head of the agency to approve all collective-bargaining agreements.

 1 disagree with the Court as to the proper reading of petitioners’ argument that the phrase ‘(representative of the agency” refers only to the entity that has a collective-bargaining relationship with a union. I do not take petitioners to mean that OIG’s representative did not represent the “agency,” NASA, for the simple reason that only Space Center management had a collective-bargaining relationship with P’s union. If that were truly petitioners’ view, its later argument that OIG cannot represent NASA because the IG is substantially independent from the agency head would not make sense — it would be enough for petitioners to argue that OIG is not under the control of the Marshall Center’s management. Rather, as petitioners make clear in their reply brief, they are simply arguing that “a ‘representative of the agency’ must be a representative of agency management, as opposed to just another employee.” Reply Brief for Petitioners 2, and n. 4. It appears that they would agree, in accordance with the Authority’s precedent, see, e. g., Air Force Logistics Command, 46 F. L. R. A. 1184,1186 (1993); Department of Health and, Human Services, 39 F. L. R.A. 298, 311-312 (1991), that NASA headquarters also qualifies as agency management under the FSLMRS, even though it lacks a direct collective-bargaining relationship with a union, because it directs its subordinate managers who have such a collective-bargaining relationship.

 The Act provides that the Inspector General “shall not report to, or be subject to supervision by,” any other agency officer. 5 U. S. C. App. § 3(a).

 The Court, ante, at 240, does not report the full story with respect to Inspector General supervision. We were told at oral argument that Executive Order 12993, 3 CFR 171 (1996), governs the procedures to be followed in those instances where the Inspector General and NASA’s Administrator are in conflict. Tr. of Oral Arg. 51-52. Complaints against an Inspector General are referred to a body known as the “Integrity Committee,” which is composed “of at least the following members”: an official of the FBI, who serves as Chair of the Integrity Committee; the Special *255 Counsel of the Office of Special Counsel; the Director of the Office of Government Ethics; and three or more Inspectors General, representing both the President’s Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency. The Chief of the Public Integrity Section of the Criminal Division of the Department of Justice, or his desig-nee, serves as an advisor to the Integrity Committee with respect to its responsibilities and functions under the Executive Order.

 The Inspector General, however, does not have the authority to subpoena documents and information from other federal agencies. See 5 U. S. C. App. §§ 6(a)(4), 6(b)(1).

 The Court posits, ante, at 241, that “nothing in the [Inspector General Act] indicates that, if the information had been supplied by the Administrator of NASA rather than the FBI, NASA-OIG would have had any lesser obligation to pursue an investigation.” It appears shocked at the proposition that petitioners might think that “even when an OIG conducts an investigation in response to a specific request from the head of an agency, an employee engaged in that assignment is not a ‘representative’ of the agency within the meaning of [5 U. S. C.] §7114(a)(2)(B).” Ibid. The answer to the Court is quite simple. So far as the Inspector General Act reveals, OIG has no obligation to pursue any particular investigation. And presumably the Court would agree that if NASA’s Administrator referred a matter to the FBI or the Drug Enforcement Administration (DEA) (who also, we are told, rely on agency management to compel an employee’s appearance at an interview, Reply Brief for Petitioners 5-6), those independent agencies would not “represent” the agency. I fail to see how it is different when the investigatory unit, although independent from agency management, is housed within the agency.